Ian DAWES, # 88–B–0326, Plaintiff,

v.

Commissioner Thomas A. COUGHLIN, III; R.J. McClellan; Deputy Superintendent M.L. Hollins; Deputy Superintendent M. McGinnis; Grievance Supervisor James Meck; Sgt. T.C. Cleveland; Sgt. K. Foley; Corrections Officer C. Wright; Corrections Officer R. Hart; R. Murphy; Corrections Officer D. French; and Corrections Officer S. Evertts, Defendants [1].

No. 93–CV–6545.

United States District Court, W.D. New York.

Sept. 24, 2002.

---

1. Following the Court's September 27, 2001, Decision and Order, the only remaining defendants

are: Sgt. T.C. Cleveland; Corrections Officer C. Wright; Corrections Officer R. Hart; R. Murphy;

Ian Dawes, # 88–B–0326, Upstate Correctional Facility, Malone, NY, plaintiff pro se.

Gary M. Levine, Assistant New York State Attorney General, Rochester, NY, for defendants.

### DECISION and ORDER

SIRAGUSA, District Judge.

## I. Introduction

This is a prisoner civil rights case, which is now before the Court on defendants' motion [docket # 63] to dismiss plaintiff's complaint as a sanction for his refusal to answer relevant questions at a Court authorized deposition. For the reasons stated below, defendants' motion is denied.

## II. Background

The detailed background of this case was previously set forth in the Court's September 27, 2001, decision and order which granted, in part, summary judgment to defendants

Corrections Officer D. French; and Corrections Officer S. Evertts.

and will not be repeated here. The following are facts significant to the issue now before the Court. On January 10, 2002, United States Magistrate Judge William G. Bauer, to whom the case had been referred by the Court pursuant to 28 U.S.C. § 636, entered an Order [docket # 61] granting defendants' request to depose plaintiff pursuant to Federal Rule of Civil Procedure 30(a).[2] Judge Bauer's order contained, *inter alia*, the following language in bold print:

> **TAKE NOTICE that non-compliance with the deposition may lead to sanctions pursuant to Federal Rule of Civil Procedure 37 including dismissal of the complaint.**

Judge Bauer's Order, however, did not contain any language compelling defendant to answer questions, only the admonishment reproduced above.

Defendants' counsel, Assistant Attorney General Gary Levine, traveled to Malone, New York, from Rochester, New York, a distance of approximately 230 miles, in February 2002, to depose plaintiff in accordance with Judge Bauer's Order. On February 11, 2002, plaintiff was duly sworn by a notary public, and Mr. Levine asked him some preliminary questions. Dawes Deposition at 1–10 ("Tr."). However, when Mr. Levine moved to the topic of plaintiff's allegations that corrections officers at Attica Correctional Facility ("Attica") used excessive force against him in September 1993, plaintiff responded, "I have a problem about speaking about that incident." Tr. at 10. Mr. Levine asked plaintiff if he remembered the incident, and plaintiff responded:

> Sure, I do. But as I stated, I have a problem speaking about that incident right now because due to my situation here. I am being threatened prior to coming to this deposition. I am being threatened [with] death threats, assault threats if I come down here and speak on those incidents [*sic.*].

Tr. at 10–11. Mr. Levine assured plaintiff that, "[i]t's just the three of us in the room,

2. Leave of court is required to depose incarcerated individuals. Fɛᴅ.R.Cɪᴠ P. 30(a)(2).

and everything you say, obviously, you have been through this before, and everything you say will be taken down. All I am going to ask you to do is just tell me the truth and to the best of your memory." Tr. at 11. Plaintiff responded,

> What I'm telling you before we go there, I would like to place on the record what's been going on here and where it is what [*sic.*] making it difficult for me to speak on this incident right now, which, you know, I know that it is a possibility that the suit might be dismissed if I don't cooperate with this deposition, and I would like to get on the record for the court to review what's happening here.

Tr. at 11.

Plaintiff then proceeded to describe his use of the grievance process at Upstate Correctional Facility ("Upstate") to address, "several abusive conduct [*sic.*] that have been going on here at this facility, including prostitution activities, and things of that nature, which was investigated by the Attorney General's Office." Tr. at 12. Following further discussion on the record, plaintiff eventually told Mr. Levine, "[w]hat I am saying to you is if you hear what is happening and you could assure me that my safety will be, you know, my safety will be secure, then I can testify." Tr. at 12. Plaintiff and Mr. Levine then engaged in extensive discussion on the record culminating with Mr. Levine's statement, "[i]f you are not going to be answering my questions, put your reasons on the record. I will be moving to dismiss." Tr. at 15. Plaintiff acknowledged Mr. Levine's position, but continued to discuss his grievances at Upstate. *Id.* at 15–18. Plaintiff then alleged that "they tell me they will murder me here before I leave," and,

> I was threatened by the gallery sergeant. His name is Sirniak (phonetic), who tell [*sic.*] me he is the one who informed me about the numerous prisoners had [*sic.*] died here since this facility opened and there has never been an indictment, and I am next on the list. If I go down there

and run my mouth at this deposition, I could expect that.

Tr. at 17. Plaintiff then told Mr. Levine, "I will appreciate if you let me out of this room so I can go back to my cell as soon as possible. I am scared. I don't know what to say to you. I want that to be brought before the judge so that, you know, whatever action the judge can take can be taken." Tr. at 18. Plaintiff told Mr. Levine that by refusing to answer deposition questions he was not acting voluntarily, but that he was "forced into this situation by threats." Tr. at 19.

Further exchanges between plaintiff and Mr. Levine clarified the connection between plaintiff's refusal to testify at the deposition concerning the alleged beating he received in 1993, with the threats he alleged he received in February 2002, the time of the deposition. Mr. Levine asked plaintiff, "[y]ou are afraid to testify about events that took place in 1993, but you are not afraid to testify about the events that happened today?" Plaintiff responded,

> I have no choice. The reason why I am not testifying about the incident in 1993[is] because I want these fact [*sic.*], I know that what I am telling you right now is have [*sic.*] to be brought before a judge. If I don't participate in this deposition, it have [*sic.*] to be brought before a federal district judge. That's the reason I am not doing if [*sic.*] I want somebody to be notified of what's going on.

Tr. at 20.

On March 28, 2002, defendants filed the motion now before the Court to dismiss the complaint under Federal Rule of Civil Procedure 37 as a result of plaintiff's refusal to answer questions posed by defendants' counsel during the Court authorized deposition. In support of the motion, defendants filed [3] affidavits from Sergeant Ted Zerniak, Sergeant Harold Perry and Sergeant Bruce Banker, all assigned to Upstate. Each affiant stated that at no time had he ever threatened plaintiff, nor discussed the consequences of plaintiff's testifying at the deposition.

---

**3.** Due to the seriousness of plaintiff's allegations, the Court ordered defendants to reply, and the affidavits were filed as part of defendants' reply.

Plaintiff's papers in opposition raise an issue of retaliatory conduct by officers at Upstate in response to his filing a civil action in this Court in September 2001 against Nurse Barbara Higley, an employee of Attica Correctional Facility. *See* Affidavit in Opposition to Defendants' Motion for Discovery Sanction ("Plaintiff's aff.") at 2. In his affidavit, Plaintiff alleged the existence of a complex conspiracy involving Nurse Higley at Attica, Nurse D. Buffham, Nurse C. Fairchild and Sergeants H. Perry, Banker and Zerniak at Upstate. Plaintiff's aff. at 2–3. Plaintiff alleged that out of a fear that her prostitution activities at Attica would be discovered, Nurse Higley telephoned Nurse Buffham at Upstate when the former received plaintiff's civil complaint, which he states he filed in this Court under docket number 01–CV–4276[4], and which he also states was served on Nurse Higley on September 17, 2001. Plaintiff claimed in an affidavit that Nurse Buffham is also involved in prostitution activity at Upstate and that she agreed with the corrections sergeants named above to "pursue [plaintiff] in a[n] 'ad hominem' manner for the purpose of discrediting and undermining any potential complaints that they thought [he] would file concerning her prostitution activities." Plaintiff's aff. at 2.

Plaintiff further alleged in his affidavit that on September 20, 1997, three days after the phone call between Nurse Higley and Nurse Buffham described above, that Nurse Fairchild at Upstate filed a false misbehavior report claiming that plaintiff made "lewd remarks of a sexual nature" to her, consisting of, " 'he would like to do my business, and that I should stop bothering with the white boys.' " Plaintiff's aff. at 3 (source of quotation not identified in plaintiff's aff.). Plaintiff also claimed that Sergeants Perry, Banker and Zerniak, along with corrections officers they supervised, agreed to censor plaintiff's mail in order to prevent him from disclosing the prostitution allegations to any other person outside the facility. He further claimed that from September 2001 through

February 2002, he received over fifteen misbehavior reports "that were either provoked, staged, manufactored [*sic.*], or falsely written in retaliation" and that resulted in the imposition of punishment. Plaintiff's aff. at 3. In addition, plaintiff alleged that each of his attempts to file complaints concerning the officers' conduct, with either the superintendent's office or the Inmate Grievance Resolution Committee, was intercepted by officers he named in the affidavit. *Id.*

Plaintiff relates, however, that he was able to get a letter out to his attorney[5] in November 2001 notifying him of the prostitution activity he alleged existed "between medical and security staff and of the overt retaliatory harassment that was being" taken against him. Plaintiff's aff. at 4. He claimed that as a result of his complaint, the New York Inspector General's office commenced an investigation, and as a consequence, Nurse Buffham was suspended for one month, Nurse Fairchild was suspended for two months and another individual was dismissed, but that the three sergeants "were able to escape punishment by falsely claiming ignorance to what was going on." Plaintiff's aff. at 4.

As a result of plaintiff's ability to cause an investigation to take place, he alleged that the corrections sergeants have encouraged the officers working for them at Upstate to "carry out against [plaintiff] harassment and provocations in the most overt brazen manner, calculated and aimed to get [him] to commit suicide or to stage and elicited [*sic.*] a use of force incident where they can have a legal basis to convey [*sic.*] premeditated murder against [him]." *Id.* Plaintiff further claimed that he has been able to grieve these incidents and lists fourteen grievance numbers in his affidavit. *Id.* Plaintiff also alleged incidents of harassment which he claimed have been occurring against other prisoners at Upstate, in particular, one inmate, whom he identifies as Walter Harvest, 98–A–2416, and asserted that he committed suicide on

---

4. The correct docket number is 01–CV–6276 and the case is *Dawes v. Kelly, et al.* The case is pending before the undersigned and is now in the early stages of discovery.

5. Plaintiff does not identify whether the attorney represents him in another matter. He is proceeding *pro se* in this court.

February 17, 2002 as a result of the supposed harassment. *Id.* at 5–6. Defendants' reply papers do not shed any light on these allegations, other than to deny any threats were made by the three corrections sergeants.

Plaintiff further claimed that on February 8, 2002, Sergeant Banker and Sergeant Perry learned of his scheduled deposition with the Attorney General's office, but were not aware of the subject of the deposition. *Id.* He stated that this made them "paranoid that their involvement in the prostitution activity with medical and security staff was the subject of the deposition and threaten [*sic.*] that if [he] participated in [the] deposition and jeopardize[d] their livelihood, [he] would not leave [Upstate] alive." Plaintiff's aff. at 6. Plaintiff also alleged that Sergeant Zerniak made similar threats to him on February 11, 2002, the day of the deposition.

Additionally, plaintiff alleged that his allegations resulted in an investigation by the acting superintendent of Upstate and the Inspector General's office, which, he claimed, revealed that Sergeant Banker and Officer P. Bourdeau had been censoring, without authority, all of plaintiff's outgoing mail and that each of them was suspended for one week. As a result, he states, Sergeant Banker's death threats have "become even more significant." *Id.* at 7. Plaintiff requests that the Court "issue a protective order that would enable plaintiff to litigate his case without intimidation," and deny defendants' motion for dismissal.

### III. Analysis

#### A. Rule 37 Sanctions

Where a party physically appears for the taking of his deposition, but refuses to cooperate by testifying, the proper procedure is first to obtain an order from the court, as authorized by Rule 37(a), directing him to be sworn and to testify. This serves the purpose of impressing upon the party the seriousness of his actions and avoids a default judgment resulting from some misunderstanding on his part. If the party then refuses to obey the court's order, Rule 37(b) authorizes the court to impose the drastic sanction of dismissal. *See Securities and Exchange Commission v. Research Automa-*

*tion Corp.,* 521 F.2d 585, 589 (2d Cir.1975). As the Second Circuit has stated,

> [t]he plain language of Rule 37(b) requires that a court order be in effect before sanctions are imposed and we have clearly held that "dismissal under this subdivision [is] improper in the absence of an order." *Israel Aircraft Indus., Ltd. v. Standard Precision,* 559 F.2d 203, 208 (2d Cir.1977), (*citing Fox v. Studebaker–Worthington, Inc.,* 516 F.2d 989, 995 (8th Cir.1975)).

*Salahuddin v. Harris,* 782 F.2d 1127, 1131 (2d Cir.1986); *see Rivera v. Simmons,* 116 F.R.D. 593 (S.D.N.Y.1987) (plaintiff's repeated failure to comply with defendants' discovery request and the Court's orders justified sanction of dismissal).

#### B. Discussion

The imposition of sanctions under Rule 37 lies within the discretion of the district court. *See Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1365 (2d Cir.1991); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988). Clearly under the law of this Circuit, however, the sanction of dismissal is not available in this case. Though Judge Bauer's order authorized plaintiff's deposition, and warned him about sanctions, the Court finds it did not amount to an order compelling plaintiff to answer the questions under penalty of dismissal of his suit. Defendants' cite *Frank v. Frank,* 1999 U.S.Dist. LEXIS 7998 (S.D.N.Y. No. 97 Civ. 5380(DAB)(RLE), May 25, 1999) in support of their application. That case, however, is factually distinguishable from the one at bar in that Frank repeatedly failed to appear for scheduled depositions, following which the court there entered two orders to comply. Frank continued with his noncompliance, making dismissal an available sanction. Here, plaintiff did appear for the deposition and he has not been ordered to answer questions.

It also appears to the Court that plaintiff's refusal to answer questions, though intentional, was for the purpose of transmitting information to the Court, which plaintiff claimed he was unable to transmit in any other manner at that time. Defendants' reply papers do not specifically address his

claim and even postulate, that regardless of the existence of threats, plaintiff should not have been deterred from answering questions about the September 1993 incident. Though plaintiff's excuse may be suspect, since in November 2001 he was able to transmit information to an attorney outside the correctional facility, the Court cannot conclude that plaintiff, now that he has aired his grievances on the record at defendants' expense [6], will continue to refuse to be deposed concerning the September 1993 allegations. If he does do so, however, defendants' counsel may seek an order compelling him to testify from Magistrate Judge Bauer, or, if he is unavailable, this Court, and if plaintiff continues to refuse to answer, then defendants may renew their motion for dismissal.

### IV. Conclusion

In light of the posture of the case, the Court will not impose the sanction of dismissal against plaintiff at this time. Plaintiff is now well aware that if the Court issues an order to him to answer questions, his willful failure to do so can result in dismissal pursuant to Rule 37.

In the last paragraph of his affidavit in opposition to defendants' motion, plaintiff requested the issuance of a protective order, but did not state what protections he sought. Thus, the Court denies plaintiff's request without prejudice. It is, therefore, hereby

ORDERED, that defendants' motion (docket # 63) for dismissal as a sanction for failure to answer questions at a court-authorized deposition is denied without prejudice; and it is further

ORDERED, that the referral to Magistrate Judge Bauer (document # 59) remains in effect and the case is returned to him for further action under the referral.

IT IS SO ORDERED.

---

**6.** Defendants have not asked for any financial sanction, stating that it would not have any effect.